Receipt # 062149

ORIGINAL

ECF

FILED
JAN 14 2005
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| A.A.B JOINT VENTURE<br>P.O. Box 37<br>Rosh Ha' Aiyn<br>68100 Israel,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 05- 114C |

**COMPLAINT**

COMES NOW, Plaintiff A.A.B Joint Venture, by its undersigned attorneys, and for its complaint against Defendant the United States of America, seeks monetary damages and other relief on its claims, and for grounds therefor states as follows:

## I. THE PARTIES

1. Plaintiff A.A.B Joint Venture ("Contractor" or "Joint Venture") is a joint venture consisting of co-venturers ABB Susa, Inc., A. Arenson, Ltd. and Baran Group. Under the Joint Venture Agreement the parties are equal equity partners, ABB Susa, Inc. is managing partner. The Joint Venture was formed to bid on, and perform, a contract with the United States of America, which contract is the subject of this action.

2. Defendant the United States of America (the "Government") is a party to the contract at issue, acting by and through the United States Army Engineer Corps-Europe ("USACE"), located in Wiesbaden, Germany.

## II. JURISDICTION

3. This suit seeks *de novo* review of the Contracting Officer's "deemed denial" of certain certified claims by the Joint Venture. This Court has jurisdiction over this action pursuant to § 10(a) of the Contract Disputes Act of 1978 (41 U.S.C. § 609(a)) ("CDA") and 28 U.S.C. § 1491.

## III. FACTS COMMON TO ALL COUNTS

4. The project consists of the design and construction of a storage and logistics based complex for use by the Israeli Defense Force ("IDF"), which was a party to the solicitation requirements. The project, known as the Nachshonim Military Storage Base, is located near Elad, approximately 20 km east of Tel Aviv, Israel (the "project"). USACE is the owner and administrator of the project until completion. The base complex consists of approximately 200 buildings, 119 of which are Dry Storage Buildings ("DSBs") specifically designed to house heavy military equipment in a ready state within a controlled climate, minimizing environmental impacts from temperature and humidity. The contract contemplated that the DSBs would consist generally of a concrete sub-structure and walls set upon drilled/cast piles or spread footings, a structural steel roof (conventional or space-type frame) and outer insulated paneling. The remaining buildings are conventional structures used for logistics, office space, and public and auxiliary use necessary for the operation of the base. The base occupies a circular area of approximately 1,600,000 square meters, or approximately 400 acres, with the buildings located in a radial pattern around two ring roads and ten radial roads, dividing the area into ten segments and one central area. Heavy earthwork, site preparation and the implementation of communications and control systems were

included in the scope of the project. Design work by the Contractor was limited to the buildings and the communications and control systems. USACE provided the design, drawings and specifications for the site infrastructure and development. The Contractor design for the buildings had to be coordinated with the overall site design and was also governed by a conceptual design based on the requirements of the solicitation's General and Special Specifications that included certain testing and performance specifications.

5. Contractor submitted its proposal and bid for the project on April 9, 2001.

6. On June 5, 2001 Contractor was awarded Contract No. DACA90-01-C-0043 (the "Contract") for $124,089,176. The performance period was stipulated as three years (1,095 calendar days) after the June 19, 2001 Notice to Proceed, establishing an original contract completion date of June 18, 2004.

7. During the course of contract performance, several disputes arose between the parties. The claims asserted in this Complaint represent claims or costs incurred by the Joint Venture and/or its subcontractors and suppliers. To the extent that said claims and/or costs relate to subcontractor costs, such costs are sponsored by the Joint Venture pursuant to its obligations under the respective subcontracts.

**COUNT I**
**(TCN LABOR)**

8. This Count specifically involves a claim by the Joint Venture for an equitable adjustment in contract price in an amount in excess of $8,086,367 and a compensable time extension of 103 calendar days.

9. Alternatively the Joint Venture is entitled to a 103-calendar day excusable non-compensable time extension under FAR 52.249-10 and/or Special Contract Requirement SR-27.

10. The contractual basis for the claim also includes respectively, FAR 52.242-14, Suspension of Work; FAR 52.243-4, Changes; and FAR 52.233-1, Disputes.

11. A. Arenson, Ltd. and Baran Group, are experienced Israeli construction contractors having continuously performed construction work in Israel for 35 years and 25 years respectively.

12. By virtue of and as a result of the aforementioned experience, the Joint Venture was familiar with, and contracted with reference to, the well-established practices pertaining to availability and utilization of labor in Israel.

13. Specifically, through the 1990's and up to the execution of the Nachshonim Contract, the well-established practice in Israel was that substantial numbers of third country nationals ("TCNs") were utilized to perform construction work in Israel.

14. On information and belief, the number of third country nationals employed in Israel grew steadily and dramatically on an annual basis (with the exception of 1997) through the 1990s, as a result of security measures that hindered the regular entry of Palestinians residing in Gaza and the West Bank into Israel.

15. On information and belief, the demand for TCN construction workers rose even more substantially in 2001, the year the contract was executed, due to the deterioration in the security situation caused by the Palestinian Intifadah.

16. The Joint Venture relied upon the established practice of bringing foreign workers into Israel and bid the project on the reasonable assumption that it would utilize TCN labor to perform a majority of the work.

17. Specifically, the Joint Venture's Technical and Management Proposal under Early Mobilization and Procurement Measures ("EMPM") provided for making

final arrangements for the location and subcontracting of TCN labor. Section 3.2.2 of the EMPM states "SAB proposes to utilize one of the local manpower companies to provide third country nationals (TCNs for unskilled, semi-skilled and skilled labor). Workers will come from either Romania or Turkey. Approximately 500 TCN workers are needed at peak production." In accordance with SR-14 of the contract, the Technical and Management Proposal also included the Third Country National Tax Plan, which delineated the expected number of TCNs during the course of the project.

18. The reasonableness of the Joint Venture's assumption that it would utilize TCN labor is supported by other provisions of the contract.

19. Specifically, the contract specifications, read as a whole, provided for the Joint Venture's use of third country nationals, subject only to the reserved right of the Government of Israel to limit access to designated security areas and refuse entry of specified individuals.

20. The pertinent portion of Special Contract Requirement SR-22 states:

> Contractor may arrange, through the appropriate Government of Israel offices, to bring into Israel US nationals and nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work.

21. Other contract provisions also support the position that the contract expressly contemplated the use of TCNs. For example, the Instructions to Bidders §00100 ¶13 "Third Country National Tax Plan" ("TCNTP") mandated that the J/V proposal "...shall include a Third Country National ("TCN") tax plan." The provision also required that an updated plan must be submitted to the Contracting Officer "...in the event of significant changes in expenditure levels or timing of TCN workers during the performance of the contract."

22. Accordingly, the contract provisions, the Joint Venture's reasonable bidding assumptions and the well-established Israeli TCN practices resulted in a U.S. Government warranty that the Joint Venture would be able to utilize, as necessary, third country nationals having diplomatic relations with Israel.

23. The Joint Venture submitted its proposal and bid for the project on April 9, 2001. Thereafter, on June 5, 2001, the Joint Venture was awarded Contract No. DACA 90-01-C-0043 for $124,089,176. Notice to Proceed was issued on June 19, 2001 establishing an original contract completion date of June 18, 2004.

24. Contrary to the contract provisions, the Joint Venture's reasonable bidding assumptions, and the well-established Israeli TCN practices, the Israeli Government enacted a series of drastic policy changes, implemented by decrees, which have prevented the Joint Venture from importing <u>any</u> foreign workers to perform on the project.

25. First, Government Resolution 642, dated September 2, 2001 reduced the quota of foreign workers by 10,000 per year for the years 2003-2005.

26. Next, in December, 2001, six months after NTP, the Israeli Government enacted an immediate decrease in the number of permits available for bringing in foreign workers.

27. On December 4, 2001, the Israeli Government announced that on January 1, 2002, the entrance of new foreign workers into Israel would be <u>absolutely prohibited</u> (hereafter known as the "Closed Sky" policy) and the maximum annual number of permits for foreign workers granted in the construction industry would be 23,000, to be recruited from those foreign workers already in the country. (This was amended on July

11, 2002 from 23,000 to 30,000 which was still a substantial reduction from the 45,000 granted on December 24, 2001).

28. On July 1, 2002 the Israeli Government imposed a punitive levy on the employment of foreign workers equal to 8% of each foreign worker's salary; further exacerbating the problem and making it more difficult for the Joint Venture to employ foreign workers.

29. Further, and of great significance, after contract award the Ministry of Interior implemented the "Deserters" policy. Under this policy, contractors whose foreign workers deserted them but did not leave Israel were prevented from employing another foreign worker in the place of a deserting foreign worker, even if the contractor had made all possible efforts to locate the employee and to deport him. Only a contractor who could show that a foreign worker had already left the country could obtain a "credit" and bring in or employ another foreign worker in his place.

30. The Joint Venture has aggressively and persistently attempted to mitigate the effects of these restrictions by employing foreign workers who originally entered Israel under work permits granted to Arenson for other projects, and the vigorous and repeated institution of legal proceedings against the Israeli government.

31. The Joint Venture has made extraordinary efforts to maintain adequate labor and skilled crafts to prosecute the work.

32. The Joint Venture provided written notice of these problems repeatedly to the U.S. Government, including but not limited to, Joint Venture letters dated May 1, 2002, November 11, 2002, talking points for a March 5, 2003 meeting in Wiesbaden, March 16, 2003, June 25, 2003 and July 24, 2003. In addition, problems associated with

the inability to import third country nationals were specifically noted in connection with the submission of pay estimates 6 (February 2002), 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43 and 44 (October 2004).

33. The quota reductions, "Closed Sky" Policy and "Deserters" Policy in combination, resulted in a drastic policy change by the Israeli Government which has prevented the Joint Venture from utilizing TCN labor, as it reasonably contemplated in its bid and as warranted by the U.S. Government. Indeed, as of this date, the Joint Venture has not obtained a single entry permit to bring a TCN into Israel for the project, despite the vigorous and persistent efforts of the Joint Venture.

34. The inability to import foreign workers into Israel through 2003 was further exacerbated by a more stringent labor policy, concentrated on enforcing expired visas, deporting illegal workers and monitoring contractor visa allotments. These actions were all contrary to the U.S. Government's warranty and had the net effect of eliminating TCN usage.

35. On information and belief, critical activities, in particular concrete construction, steel frame erection and insulated panel installation were adversely impacted by the Government's breach of warranty pertaining to TCN labor. The Joint Venture's inability to maintain labor levels and contract skilled TCN labor caused a 103 calendar day delay between April, 2003 and November, 2003. This delay is attributable to the lack of TCN manpower.

36. In addition, even when the Joint Venture was able to procure local labor, it was more expensive than the TCN labor rates that had been the basis of the Joint

Venture's bid, the available Israeli labor proved less productive than the TCN labor and the Joint Venture's subcontracts included more expensive and less productive Israeli labor.

37. By letter dated July 30, 2004 the Joint Venture submitted its certified claim to the Government and requested a Contracting Officer's final decision.

38. The Contracting Officer did not within sixty (60) days of receipt of the Certified Claim as required by §605(c)(2) of the Contract Disputes Act either, (a) issue a decision, or (b) notify the Joint Venture of the time within which a decision would be issued.

39. In accordance with 41 U.S.C. §605(c)(5), the failure of the Contracting Officer to issue a decision within the period required or notify the Joint Venture of the time within which a decision would be issued is deemed to be a decision of the Contracting Officer denying the claim and authorizing the commencement of suit on the claim.

40. The relevant contract language, and surrounding circumstances establish the existence of a U.S. government warranty that the Joint Venture would be able to utilize, as necessary, third country nationals from countries having diplomatic relations with Israel. This warranty was breached by the decrees, special orders and policies of the Government of Israel which prevented the Joint Venture from utilizing third country nationals in violation of the warranty. This breach of warranty caused the Joint Venture to perform additional work beyond that required by the contract and/or the Joint Venture was directed to change its planned method or manner of performing the contract work, for which the Joint Venture is entitled to an equitable adjustment pursuant to FAR

52.243-4 entitled "Changes" of the Contract General Provisions for all additional costs, impacts and delays incurred as a result, in an amount in excess of $8,086,367 and a 103 calendar day compensable time extension.

41. Alternatively, the Joint Venture and the U.S. Government, at the time of contract formation, made a mistake as to a basic assumption which had a material effect on performance which the Joint Venture did not assume the risk of; namely that the Joint Venture would be able to utilize, as necessary, third country nationals from countries having diplomatic relations with Israel. The Joint Venture is entitled to reformation under the theory of mutual mistake of fact by adjusting the contract price and schedule to reflect the delay and additional costs incurred as a direct and proximate result of the mutual mistake for all additional costs, impacts and delays incurred as a result, in an amount in excess of $8,086,367 and a compensable time extension of 103 calendar days.

42. The Joint Venture alternatively requests that the Court find it is entitled to a 103 calendar day noncompensable time extension for the following reasons: (a) the TCN labor shortages were due to abnormal circumstances which the Joint Venture could not have reasonably anticipated at the time of contract award; (b) under FAR 52.249-10 the acts of the Israeli Government were sovereign acts which occurred for unforeseeable reasons beyond the control and without the fault or negligence of the Joint Venture and (c) SR-27 "War Risk" provides for excusable delay under these circumstances.

WHEREFORE, A.A.B Joint Venture, respectfully requests this Honorable Court to grant judgment in favor of A.A.B Joint Venture against defendant, the United States of America as follows:

a. Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

b. Time extension relief in such amounts as the Court, based on the evidence produced at trial, deems appropriate;

c. Statutory interest under the Contract Disputes Act; and

d. Such other and further relief as the Court deems proper.

**COUNT II**
**(ERRONEOUS REJECTION OF ALTERNATE PAINT SYSTEM)**

43. The building envelope, in all areas indicated on the drawings, was required to be pre-painted insulated panels.

44. Contract Specification Section 02-003, page 28, Chapter J, Building Envelope, Paragraph 2, Insulated Panels, provides in pertinent part, the following with respect to the paint system:

> The walls and roofs exterior facing shall not be less than 0.55 mm. galvanized trapezoidal steel SAE 1020, painted with ppvdf (primer paravinil de fluor 10+40 micron) coating (50 microns).

45. The only reasonable interpretation of this specification is that the steel sheet is a "minimum," not the thickness of the paint system. The inserted comma precludes the interpretation that the thickness of the paint system (50 microns) is <u>also</u> a minimum.

46. After certain efforts were made with respect to procurement of the panels, not pertinent hereto, the Joint Venture by letter dated December 2, 2003, submitted RFI C-0071 which stated "Prior to making a new order [of panels] concern is being raised as to the suitability of the existing specification relative to the thickness of the pvdf prime coat, pvdf layer…." The Joint Venture requested that the Government and its consultants

provide confirmation that the panel coating requirement was correct as stated in the specification.

47. The Government responded by letter dated December 9, 2003, stating in pertinent part "I am willing to review alternate solutions that are structurally sound provided the metal skin in [is] warranted for twenty years."

48. Based thereon, the Government stated that it would consider alternates and that the only criteria for the review of such alternates would be: (1) structural soundness and (2) compliance with the twenty year warranty. Significantly, the Government did not state that the specifications required a minimum thickness.

49. In reliance upon this statement the Joint Venture made an exhaustive search to identify a proven paint system with a twenty year warranty. These efforts were undertaken in reasonable reliance on the COE's representation that it would review such alternates without demanding compliance with any particular thickness requirement.

50. The Joint Venture completed its search and on January 26, 2004, submitted RFI 0181 to the Government. The RFI described in detail the Italpannelli (La Magona ) 20/20 micron (Duracor 40) paint system and the Thyssen Krupp 5-primer/20 PVDF color coat/15 PVDF clear coat (total 40 microns). The RFI also noted that both panel paint systems would be a modification to the specified thickness.

51. By letter dated January 30, 2004, the Government stated that the Italpannelli panels were "not acceptable," based on the conclusion that the paint had 70 percent resin. However, the specifications did not contain a resin requirement and the Government has to this date failed to demonstrate that this slight difference would render the panel or paint system structurally unsound.

52. The Government also evinced a dismissive attitude towards the Thyssen Krupp panel and proposed paint system, in spite of the fact that the system was structurally sound and included the required 20 year warranty.

53. Accordingly, the Government rejected and/or dismissed both proposed panels and their paint systems without justification, since both systems were structurally sound and carried the required 20 year warranty.

54. The Government's formal rejection of the Duracor 40 and its criticism of the Thyssen Krupp panel were erroneous in that both systems met the Government's requirements for acceptable alternates.

55. In its letters of March 25, 2004 and April 12, 2004 the Government asserted for the first time, the unreasonable position that the contract stated a minimum thickness requirement for the paint configuration.

56. Further, in its April 12, 2004 letter the Government directed the Joint Venture to submit "an acceptable panel system that meets contract requirements" within 10 days of receipt of its letter.

57. On April 22, 2004, in response to the Government's directive the Joint Venture submitted Italpannelli/La Magona S4 20/20/20 (60 micron) paint system, which was approved by the Government on April 30, 2004.

58. The Government's assertion that the specification clearly states a minimum thickness requirement is erroneous.

59. The Government's conduct between December, 2003 and March, 2004 constituted a waiver of any right it may have had to require a 10+40 micron paint thickness. During this time frame the Government's position was that it would consider

alternates that were structurally sound and carried a 20 year warranty, without consideration of paint thickness.

60. Therefore, the Government administered the contract in such a way as to reasonably give the Joint Venture the impression that the 10+40 paint thickness requirement had been suspended or waived. Under these circumstances, the requirement cannot be suddenly revived to the prejudice of the Joint Venture.

61. Accordingly, the erroneous reimposition of the constructively waived paint thickness requirement also constitutes a constructive change.

62. By letter dated August 3, 2004 the Joint Venture submitted its certified claim to the Government and requested a Contracting Officer's final decision.

63. The Contracting Officer did not within sixty (60) days of receipt of the Certified Claim as required by §605(c)(2) of the Contract Disputes Act either, (a) issue a decision, or (b) notify the Joint Venture of the time within which a decision would be issued.

64. In accordance with 41 U.S.C. §605(c)(5), the failure of the Contracting Officer to issue a decision within the period required or notify the Joint Venture of the time within which a decision would be issued is deemed to be a decision of the Contracting Officer denying the claim and authorizing the commencement of suit on the claim.

65. The Government's erroneous rejection and/or failure to approve the Italpannelli (La Magona) 20/20 micron (Duracor 40) paint system and the Thyssen Krupp 15/20/15 paint system, erroneous reimposition of the suspended and/or waived paint thickness requirement and assertion that the specification stated only a minimum paint

thickness requirement constitute constructive changes under the contract entitling the Joint Venture to an equitable adjustment pursuant to FAR 52.243-4 entitled "Changes" of the contract general provisions for all additional costs incurred in supplying the La Magona S4 (60 micron) paint system, plus impacts and delays incurred as a result, in an amount in excess of $3,526,648 and a 129 calendar day compensable time extension.

WHEREFORE, A.A.B Joint Venture, respectfully requests this Honorable Court to grant judgment in favor of A.A.B Joint Venture against Defendant, the United States of America as follows:

a. Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

b. Time extension relief in such amounts as the Court, based on the evidence produced at trial, deems appropriate;

c. Statutory interest under the Contract Disputes Act, CDA; and

d. Such other and further relief as the Court deems proper.

Respectfully submitted,

Brian Cohen
BELL, BOYD & LLOYD, PLLC
1615 L Street, NW
Suite 1200
Washington, D.C. 20036
(202) 466-6300
Attorney for Appellant

Of Counsel:

Robert J. Sciaroni
Lawrence M. Prosen
BELL, BOYD & LLOYD, PLLC
1615 L Street, N.W., Suite 1200
Washington, D.C. 20036
(202) 466-6300

Devorah Patt
Zell Goldberg & Co.
31 Mishol Hadekalim
Jerusalem 27278 Israel