BELL, BOYD & LLOYD PLLC

BRIAN COHEN
202.955.6836
bcohen@bellboyd.com

1615 L STREET N.W., SUITE 1200
WASHINGTON, D.C. 20036-5610
202.466.6300 FAX 202.463.0678

OFFICES IN WASHINGTON, D.C.
AND CHICAGO

July 30, 2004

**VIA UPS**

Resident Engineer
United States Army Corps of Engineers
Nachshonim Resident Office
Unit 7228, Box 42
APO AE 09830

Contracting Officer
Department of the Army
Engineer District Europe, Corps of Engineers
PO Box 1, Konrad Adenauer Ring 39
65187 Wiesbaden, Germany
Attention: William D. Mills

**Re: Contract No. DACA90-01-C-0043**
**Nachshonim Storage Base**
**Certified Claim and Request for Contracting Officer's Decision**
**TCN Labor**

Dear Sir:

Please be advised that the undersigned represents the A.A.B Joint Venture in connection with the above-referenced contract.

Pursuant to FAR 52.233-1 Disputes and the Contract Disputes Act of 1978 as amended (41 U.S.C. 601-613) A.A.B Joint Venture hereby submits this claim in the amount of $4,823,964 and a 55 calendar day compensable time extension. A.A.B Joint Venture specifically requests a Contracting Officer's decision in accordance with the contract and the Contract Disputes Act. A.A.B Joint Venture also claims simple interest as provided by law. You will also find enclosed an executed Claim Certification.

Very truly yours,

Brian Cohen

Brian Cohen

BC:mxg
Enclosures

36174/F/1

**DISTRIBUTION**

| NAME | ACTION | INFO |
|---|---|---|
| PROJECT DIR | | |
| CM DESIGN ENG | | |
| SITE MGR | | |
| ADMIN MGR | | |
| PROC MGR | | |
| Q.C. MGR | | |
| SAFETY MGR | | |
| SCHEDULER | | |
| | | |
| STANLEY | | |
| ARENSON | | ✓ |
| BARAN | | ✓ |
| ABB.N.J. OFFICE | | ✓ |
| B Cound - BBL | | ✓ |
| D. [illegible] - [illegible] | | ✓ |
| [illegible] - [illegible] | | ✓ |
| SUBJECT FILE | Feb 15/10.06 | |

**In reference to TCN Labor Claim:**

**CERTIFICATION**

I, S. Denison Keeney, do hereby certify that this claim is made in good faith; the supporting data are accurate and complete to the best of my knowledge and belief; the amount requested accurately reflects the contract adjustment for which A.A.B Joint Venture believes the Government is liable; and that I am duly authorized to certify this claim on behalf of the contractor, A.A.B Joint Venture.

A.A.B JOINT VENTURE

By: [signature]
S. Denison Keeney
Project Director

Date: 30 July 2004

**Certified Claim – TCN Labor**

## I. Summary of Claim

AAB JV ("J/V") requests an equitable adjustment to compensate it for the delay it has experienced because of the U.S. Government's breach of its warranty that the J/V would be able to utilize, as necessary, third country nationals ("TCNs") having diplomatic relations with Israel. As a result of this breach of warranty, and for other reasons set forth herein, the J/V is entitled to a 55 calendar day compensable time extension, associated extended performance costs and direct costs. In the alternative, at a minimum the J/V is entitled to a 55 calendar day excusable noncompensable time extension under FAR 52.249-10 or SR-27, since the delays were caused by abnormal circumstances, were the result of sovereign acts which occurred for unforeseeable reasons beyond the control and without the fault or negligence of the J/V, or fall within the excusability provisions of SR-27.

Through the 1990's and up to the execution of the Nachshonim contract, the well established practice in Israel was that substantial numbers of third country nationals were utilized to perform construction work in Israel.

The number of third country nationals employed in Israel grew steadily and dramatically on an annual basis (with the exception of 1997) through the 1990's. The constant demand for foreign construction workers stemmed directly from security measures that hindered the regular entry of Palestinians residing in Gaza and the West Bank into Israel. In fact, the demand for TCN construction workers rose even more substantially in 2001, the year the contract was executed, due to the extreme deterioration in the security situation caused by the Intifadah.

The J/V relied upon the established practice of bringing foreign workers into Israel and bid the project on the reasonable assumption that it would utilize TCN labor to perform a majority of the work. The reasonableness of the J/V's assumption is supported by the contract language and pertinent surrounding circumstances. In addition, the U.S. Government knew prior

to contract award that the J/V would utilize third country nationals having diplomatic relations with Israel.

However, contrary to the contract provisions, the J/V's reasonable bidding assumptions, and the well-established Israeli TCN practices, the Israeli government enacted a series of drastic policy changes, implemented by decrees, which have prevented the J/V from importing <u>any</u> foreign workers to perform on the project. These drastic policy changes adopted by the Israeli government were not and could not have been foreseen by the J/V, and constitute a breach of the U.S. government's warranty of the availability of TCN labor.

## II. <u>Pertinent Facts</u>

Three major restrictions enacted after contract award by the Israeli Government effectively prohibited the importation and utilization of TCN labor: 1) an overall decrease in the quota of foreign workers allowed entry into Israel; 2) the "Closed Sky" policy; and 3) the "Deserters" policy.

First, as a result of Government Resolution Number 188 dated August 22, 1999 the overall quota of foreign labor was reduced to 50,000 from 83,000, effective January 1, 2001. The Ministry of Labor and Welfare ("MOL") implemented Resolution 188 by determining that the maximum annual amount of permits that would be allocated to the construction industry for 2001 would be 26,000 as opposed to 34,000 in 2000. Thereafter, in order to mitigate the effects of the Intifadah on the construction industry, the government decided to increase the construction worker quota in the first half of 2001 by 7,000 i.e., from 34,000 to 41,000.

Government Resolution 554, August 5, 2001 approved recommendations increasing the quota by 32% when compared to 2000. However, as a result of Government Resolution 642 dated September 2, 2001 the Israeli government decided that during the years 2003-2005 the quota would be reduced by 10,000 a year (this did not apply to years 2001-2002).

Second, in December 2001, six months after NTP, the Israeli Government, spurred by the high rate of unemployment among Israelis and other social and political considerations, enacted an immediate decrease in the number of permits available for bringing in foreign workers. This represented a drastic and unforeseeable policy shift.

Thereafter, on December 4, 2001 the Israeli Government decided that the maximum annual number of permits granted in the construction and agriculture industries for 2002 would be 45,000 foreign workers. More importantly, on January 1, 2002 the MOL announced that as of that date the entrance of new foreign workers into Israel would be absolutely prohibited (the "Closed Sky" policy) and the maximum annual number of permits for foreign workers granted in the construction industry would be 23,000, to be recruited from those foreign workers already in the country. This was amended on July 11, 2002 from 23,000 to 30,000; still a substantial reduction from the original 45,000 foreign workers granted on December 24, 2001.

On July 1, 2002 the Israeli Government imposed a punitive levy on the employment of foreign workers, including construction workers, equal to 8% of each foreign worker's salary. This further exacerbated the problem making it even more difficult for the J/V to employ foreign workers.

Third, the policies of the Ministry of Interior implemented after contract award further restricted the J/V's ability to utilize TCN labor by virtue of the "Deserters" policy. In recent years workers who have legally entered into Israel with work permits granted at the request of an employer have deserted their employers to work illegally for other employers who do not have the appropriate allocations and permits. Under the "Deserters" policy, enacted by the Ministry of Interior and the MOL, contractors whose foreign workers deserted them but did not leave Israel were prevented from employing another foreign worker in the place of the deserting foreign worker. Contractors would even be prevented from replacing a deserting foreign worker if the Contractor had made all possible efforts to locate the employee and to deport him. As the policy

was implemented, only a contractor who could show that a foreign worker had already left the country could obtain a "credit" for such employee and bring in or employ another foreign worker in his place.

The quota reductions, "Closed Sky" policy and "Deserters" policy in combination, effected a radical shift in policy by the Israeli Government. As a result of these unanticipated actions the J/V has been prevented from obtaining the necessary promised TCNs. This is so in spite of the fact that the J/V has aggressively and persistently attempted to mitigate the effects of the restrictions imposed by the Israeli Government by employing foreign workers who originally entered Israel under work permits granted to Arenson for other projects, and the vigorous and repeated institution of legal proceedings against the Israeli Government in an attempt to: 1) obtain a ruling that the "Deserters" policy was void; and 2) overturn the Israeli Government's refusal to allow transfer of the allocation of 523 foreign workers from Arenson to AAB SUSA while deducting same from Arenson's allocation for 2002 and to allow the entry of these workers or employment of foreign workers already present in Israel for the project. The extraordinary efforts taken by the J/V to maintain adequate labor and skilled crafts to prosecute the work is described in the attachment to the J/V's July 24, 2003 letter to the Government, which is attached hereto and incorporated by reference as Exhibit 1.

The schedule impact of these actions was significant. The J/V's analysis demonstrates that planned monthly average manpower for critical trades began ramping up in May and June of 2003. Critical activities, particularly concrete construction, steel frame erection and insulated panel installation were adversely impacted by the Government's breach of warranty pertaining to TCN labor. In spite of the J/V's Herculean efforts, attracting and maintaining the necessary labor levels was virtually impossible given the limited labor pool, and the competition to staff construction projects caused by the "Closed Sky" and "Deserters" policies. The inability to import foreign workers into Israel through 2003 was further exacerbated by a more stringent

labor policy, concentrated on enforcing expired visas, deporting illegal workers and monitoring contractor visa allotments. These actions were all contrary to the Government's warranty and had the net effect of eliminating TCN usage, thereby breaching the Government's warranty.

The J/V's inability to maintain labor levels and contract skilled TCN labor caused a 55 calendar day delay between April 2003 and November 2003. This delay is attributable to the lack of TCN manpower. See attached summary of TCN delays (Exhibit 2). In addition; (1) even when the J/V was able to procure local labor, it was more expensive than the TCN labor rates that had been the basis of the JV's bid; (2) the available Israeli labor proved less productive than the TCN labor; and (3) the JV's subcontracts included more expensive and less productive Israeli labor. (Exhibit 3).

In short, the drastic policy changes enacted by the Israeli government enumerated above, have prevented the J/V from utilizing TCN labor, as it reasonably contemplated in its bid. In fact, until this very day not a single entry permit has been obtained to bring a TCN into Israel for the project despite the vigorous and persistent efforts of the J/V.

## III. Contractual Basis

Several bases support the J/V's request for direct costs, a compensable time extension, associated extended performance costs and direct costs.

First, it is well established that when the Government gives a warranty in its contractual capacity, and the subject matter of the warranty is frustrated by any intervening cause, including a third party, the contractor is entitled to relief. All that is necessary is that from the contract and surrounding circumstances the contract language is reasonably susceptible to the interpretation given by the contractor.

Here, the relevant contract language and surrounding circumstances demonstrate that the Government warranted that the J/V would be able to utilize, as necessary, third country nationals having diplomatic relations with Israel.

The contract specifications read as a whole provided for the J/V's use of third country nationals, subject only the reserved right of the Government of Israel to limit access to designated security areas and refuse entry of specified individuals.

The pertinent portion of SR-22 states as follows:

> Contractor may arrange, through the appropriate Government of Israel Offices to bring into Israel US Nationals and Nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work.

The fact that the contract expressly contemplated the use of TCNs is reflected in other provisions. For example, the Instructions to Bidders § 00100 ¶13 "Third Country National Tax Plan" mandated that the J/V proposal "...shall include a third country national TCN ("TCN") tax plan." The provision also required that an updated plan must be submitted to the contracting officer "...in the event of significant changes in expenditure levels or timing of TCN workers during the performance of the contract."

In addition, the J/V's Technical and Management Proposal also supports this position. Under Early Mobilization and Procurement Measures ("EMPM") the proposal provides for making final arrangements for the location and subcontracting of TCN labor. § 3.2.2 of the EMPM states "SAB proposes to utilize one of the local manpower companies to provide third country nationals (TCNs for unskilled, semi-skilled and skilled labor). Workers will come from either Romania or Turkey. Approximately 500 TCN workers are needed at peak production." The Technical and Management Proposal also included the third country national tax plan in compliance with SR-14 which delineates the expected number of TCNs during the course of the project.

Accordingly, the relevant contract language and surrounding circumstances establish the existence of a Government warranty that the J/V would be able to utilize, as necessary, third country nationals. The decrees, special orders and policies of the Government of Israel have

resulted in a breach of that warranty, preventing the J/V from utilizing third country nationals. Since a warranty exists, it is irrelevant that the warranted use was prevented by a third party, rather than by the U.S. Government. For these reasons, the J/V is entitled to an equitable adjustment in time and price for the Government's breach of warranty under the Changes Clause of the contract.

Second, it is uncontroverted that before award, the Government knew that the J/V interpreted the contract as warranting the use of TCNs on the project. In that regard, it is well established that a party who enters into a contract with the actual or imputed knowledge of the other party's reasonable interpretation of the contract's terms is bound by that party's interpretation. Thus, the U.S. Government was bound by the J/V's interpretation.

Third, after award and throughout contract performance, prior to the time the dispute arose, the Government and the J/V contemporaneously interpreted the contract as promising the J/V freedom to use third country nationals. Further, the contract does not contain any language restricting use of third country nationals, other than in SR-22 as noted above. The consistent interpretation by the Government and the J/V, before the dispute arose, regarding the availability and use of third country nationals, confirms the one reasonable interpretation of the contract language as warranting the J/V's freedom to use third country nationals.

Finally, the J/V and the U.S. Government operated under a mutual mistake of fact as to a basic assumption on which the contract was based, namely that the J/V would be able to utilize, as necessary, third country nationals having diplomatic relations with Israel. Here, both the Government and the J/V at the time of contract formation made the mistake and the mistake related to a basic assumption on which the contract was based. This mistake had a material effect on the contract and this risk was not assumed by the J/V, in light of the surrounding circumstances, the contract language and the Government's acceptance of the J/V's proposal.

Under mutual mistake the J/V is entitled to reformation of the contract by adjusting the contract price and schedule to reflect the delay and additional costs incurred as a direct and proximate result of the mutual mistake.

In the alternative, the J/V is entitled, at a minimum, to a noncompensable time extension for three reasons: (1) the TCN labor shortages are due to abnormal circumstances which the J/V could not have reasonably anticipated at the time of contract award; (2) the acts of the Israeli Government are sovereign acts which occurred for unforeseeable reasons beyond the control and without the fault or negligence of the J/V; and (3) SR-27 "War Risk" provides for excusable delay under these circumstances.

First, the decrees of the Israeli Government and the "Closed Sky" and "Deserters" policies have created abnormal circumstances, precluding the J/V from importing TCN workers as contemplated by the contract, the J/V's proposal, and the established practice in Israel. These abnormal circumstances were not and could not have been anticipated by the J/V prior to contract award. Accordingly, the J/V is entitled to a time extension due to the TCN labor shortages caused by these abnormal circumstances.

Alternatively, the acts of the Israeli Government, are sovereign acts which were unforeseeable and beyond the control and without the fault or negligence of the J/V, constituting an independent basis for granting a time extension under FAR 52.249-10. In addition, SR-27 states that, "Delays caused by hostilities, or civil unrest not amounting to hostilities, will be treated as excusable delays and may be the basis for time extensions, without increase in price." As explained in detail above, the Intifadah has been the cause of the lack of labor. Moreover, there is no dispute that the Intifadah (literally, "uprising") constitutes "hostilities" or at a minimum, "civil unrest". The delays therefore would also qualify as the basis for an excusable time extension under SR-27.

## IV. Conclusion

The J/V is entitled to a 55 calendar day compensable time extension, extended performance costs and direct costs under FAR 52.243-4, Changes, in the amount of $4,823,964. The J/V is also entitled to reformation based upon mutual mistake. In the alternative, at a minimum the J/V is entitled to a 55 calendar day excusable noncompensable time extension under FAR 52.249-10, or SR-27.

This claim addresses only the delay caused by the TCN labor issue for the period noted. The J/V expressly reserves the right to submit a claim for additional delay, compensable and/or excusable, for other periods of contract performance.

# EXHIBIT 1

ABB SUSA\ A. ARENSON\ BARAN GROUP אבב – סוסה/ א. ארנסון/ קבוצת ברן

NACHSHONIM STORAGE BASE, ELAD פרוייקט בסיס אחסון נחשונים, אלעד

24 July 2003

Ref. USACE/03-0349

Resident Engineer
United States Army Corps of Engineers
Nachshonim Resident Office
Unit 7228, Box 42
APO AE 09830

RE: DACA90-01-C-0043
NACHSHONIM STORAGE BASE

**SUBJECT: TCN Labor Availability**

Dear Sir,

In response to COE-03-090 dated July 1, 2003 the AAB JV offer the following.

Concerning availability of TCN labor for this project, attached find the facts presented to us by our legal advisors following a comprehensive review of the issues. We refute the allegations contained in your letter and point out that the AAB JV has been and continue to make extraordinary efforts to maintain adequate labor and skilled crafts to prosecute this project within the schedule.

We believe that the attached report presents compelling factual justification for our request for a time extension and equitable adjustment.

Sincerely,

S. D. Keeney
Project Director

**Attachment:**
Nachshonim Storage Base – Third Country Nationals ("TCN") and schedules attached thereto



משרד האתר: ת"ד 37, ראש העין, טל: 03-933-1473 פקס: 03-933-1366

The following provides an overview of the "TCN" problem and the measures taken by the ABB SUSA - A. Arenson - Baran Group (Joint Venture) (the "**Joint Venture**") and its members in respect of the importation and employment of foreign labor.

**Introduction**

1. The Joint Venture has exerted its utmost efforts, since inception, to arrange for the entry and/or the employment of foreign construction workers already situated in Israel, for the Nachshonim Storage Base in Elad, Israel (the "**Project**").

2. However, due to the Israeli government's rigid policy barring the importation of foreign workers ("**FWs**") into Israel and the resultant restrictions imposed by the Israeli Labor Authority (the "**LA**"), numerous efforts made on the Joint Venture's behalf have not met with positive results, until most recently.

**The Restrictions Imposed by the Israeli Government**

**General**

3. Ever since the 1990's the number of FWs allowed to enter into and to be employed in Israel grew steadily and significantly on an annual basis (with the exception of 1997). The constant demand for foreign construction workers (primarily for residential buildings) stemmed from security measures that prevented the regular entry of Palestinians residing in Gaza and the West Bank into Israel. The numbers rose even more substantially in 2001, due to the extreme deterioration in the security situation caused by the "Entifadah".

4. As illustrated below, the drastic change of policy adopted by the Israeli Government could not have been foreseen by the Joint Venture.

5. The 3 major restrictions that hindered the importation of TCN's by or for the Joint Venture were:

   5.1. An overall decrease in the quotas of FWs allowed entry ("**Quotas**");

   5.2. The "**Closed Sky**" Policy;

   5.3. The "**Deserters**" Policy.

6. For your convenience, the following summarizes the major resolutions of the Government in this respect:

**Government Resolution No. 188 – August 22, 1999**

7. On August 22, 1999, the Government decided to reduce the Quota by 23%, so that as of January 1, 2001, the maximum

annual amount of permits granted in all sectors of the economy for FWs was reduced to 50,000 (instead of 83,000).

8. In furtherance of such Resolution No. 188, the Minister of Labor and Welfare (the "**MOL**") decided that the maximum annual amount of permits that would be allocated to the construction industry for 2001 would be for 26,000, as opposed to 34,000 construction workers in 2000.

**<u>Government Resolution No. 2802 – December 31, 2000</u>**

9. On December 31, 2000, the Government decided to suspend its preceding Resolution No. 188, in light of the labor shortage caused by the deterioration in the security situation.

10. In order to mitigate the effects of the "Entifadah" on the construction industry, the Government decided to increase the construction workers Quota in the first half of 2001 by 7,000, i.e. from 34,000 to 41,000 FWs.

11. Consequently, instead of decreasing the number of FWs, the Quota rose by 20% within 16 months.

**<u>The Bucharis Report – December 31, 2001</u>**

12. On March 21, 2001, the MOL established a special committee in order to recommend measures to reduce the number of FWs in Israel.

13. On July 14, 2001, the committee submitted a report to the MOL in which the committee recommended that the maximum annual amount of permits granted in the construction industry for 2001 be increased by 4,000 (i.e. from 41,000 to 45,000) and that during each of the following 3 years the Quota for such workers be reduced by 5,000 (the "**Bucharis Report**").

**<u>Government Resolution No. 554 – August 5, 2001</u>**

14. On August 5, 2001, following its approval by a special Ministers' Committee, the recommendations that appeared in the Bucharis Report were formally adopted by the Israeli Government.

15. Consequently, the Quota for 2001 was increased by 32% in comparison to 2000.

**<u>Government Resolution No. 642 – September 2, 2001</u>**

16. On September 2, 2001, the Government decided that during the years 2003-2005 the Quota would be reduced by 10,000 a year. This decision did not apply, however, to the years 2001-2002.

**<u>The "Closed Sky" Policy – Government Resolution No. 1141 – December 24, 2001</u>**

17. In December 2001, the Israeli government decided upon a drastic shift in policy.

18. On December 24, 2001, the Government decided that the maximum annual amount of permits granted in the construction and agriculture industries for 2002 would be for 45,000 FWs.

19. In furtherance of the foregoing decision, on January 1, 2002, the MOL announced, that as of that day, the entrance of new FWs into Israel would be absolutely prohibited (the "**Closed Sky Policy**"), and that the maximum annual amount of permits granted in the construction industry would be for 23,000 FWs to be recruited from those FWs already in the country.

<u>**Government Resolution No. 2215 – July 11, 2002**</u>

20. On July 11, 2002, the government decided that the maximum annual amount of permits granted in the construction industry for 2002 would be for 30,000 instead of 45,000 FWs.

<u>**Government Resolution No. 208 – April 13, 2003**</u>

21. On July 11, 2002, the Israeli government decided that the maximum annual amount of permits granted in the construction industry for 2003 would be identical to that applicable in 2002, i.e for 30,000 FWs.

The fluctuations in the Quotas as per the aforementioned resolutions are illustrated by the following graph:




22. The following facts are particularly noteworthy:

22.1. Throughout the 12 years, that preceded September 2, 2001, the Quotas had been growing steadily.

22.2. Between September 2, 2001 and December 24, 2001, the Quota was decreased by 17,000 FWs and the entrance of new FWs into Israel was utterly prohibited (the "Closed Sky" Policy).

22.3. The Joint Venture could not have anticipated such a radical shift in governmental policy.

23. As of July 1, 2003, the Israeli government has imposed a 'punitive' levy on the employment of FWs in most sectors (including construction) equal to 8% of the FWs salary.

24. **The "Deserters" Policy**

24.1. During recent years, many contractors in Israel, including A. Arenson Ltd. ("**Arenson**"), a Joint Venture partner, have been suffering from what is referred to as the "**Deserter**" syndrome. Workers who have legally entered into Israel with work permits granted at the request of the employer (contractor), have been "deserting" their work places in order to work illegally for other employers, who do not have the appropriate allocations and permits.

24.2. The policy of the Ministry of Interior (the "**MOI**") and the MOL, has been to prevent an employer whose FWs "deserted" him but did not leave Israel, from employing another FW in his stead. This was the case even if the employer made all possible efforts to locate the employee and to deport him. Only an employer, who could show that a FW had already left the country, could obtain a "credit" for such employee and bring in or employ another FW in his stead.

**Legal Proceedings Initiated against the Israeli Government**

25. On February 18, 2002, the Israeli Contractors and Builders Association filed an administrative action to the Israeli High Court of Justice (H.C. 8722/00) against the Government, the MOL, the General Director of the LA and the MOI.

By this motion, the court was requested to pronounce Governments Resolutions No. 1141 and 642 as void, so that the Quota would not be reduced and that the entrance of new construction workers into Israel would not be prohibited.

As a result the MOI and the MOL made minor concessions in respect of the expulsion of FWs, but the foregoing resolutions remained valid.

26. On June 6, 2002, Arenson filed an administrative action to the Israeli Court of Administrative Matters in Jerusalem (A.P 582/02) against the MOL and the MOI.

By this motion, the court was petitioned to pronounce the "Deserters" policy as void and to allow Arenson to fully utilize the TCNs permits, which were allotted to Arenson for 2002, in respect of the Project, among other construction projects in which Arenson was engaged. (See paragraph 34 below).

On August 7, 2002, Arenson's counsel and the District Attorney for Jerusalem who was acting as counsel for the Ministries

reached an understanding with the aim of facilitating the importation of workers for the Project, as summarized in paragraph 46 below.

It should be indicated that the foregoing understanding, which was approved by the LA's Deputy General Manager and the representative of the MOI, was given the status of a judgement handed down by the court.

27. On August 21, 2002, Arenson filed a second administrative action to the Israeli Court of Administrative Matters in Jerusalem (A.P 738/02) against the MOL, the MOI and the Minister of Interior Security. Such motion was directed against the "Deserters" policy.

On October 3, 2002, with the consent of Ministers, an interim order was granted in A.P. 738/02 freezing the status quo, so that Arenson was not bound to deport the FWs that were actually employed by it, so long as their number did not exceed its allocation of FWs for 2002.

On May 26, 2003, the court decided that the interim orders would remain in force until a decision was reached by the Ministers, and directed the MOI to reconsider the issue.

On June 26, 2003, Arenson's counsel and the District Attorney for Jerusalem who was acting as counsel for the Ministries reached an understanding that hopefully will enable the Joint Venture to utilize the allocation of TCNs for the Project, by allowing the employment of qualified FWs already situated in Israel. (See paragraphs 66-67 below).

28. On June 24, 2003, the Joint Venture itself and its members filed another administrative action to the Israeli Court of Administrative Matters in Jerusalem (A.P 966/03) against the MOI, the LA, the Minister of Industry, Commerce and Labor (the "**MICL**"), the Minister of Defense (the "MOD") and the Foreign Workers Permits Support Unit (the "**Support Unit**").

Such motion was directed against the LA's refusal to transfer the allocation of 523 FWs from Arenson to ABB SUSA, Inc. ("**ABB SUSA**"), while deducting same from Arenson's allocation for 2002, and to allow the entry of these workers or the employment of FWs already present in Israel for the Project.

**<u>Schedule 1</u>** **A true copy of the petition that was filed by the Joint Venture in A.P. 966/03 (without the schedules thereto) and the translation thereof are attached hereto and marked Schedule 1.**

## Arenson's Attempts, on behalf of the Joint Venture to Bring In TCNs

29. Immediately after the award of the Contract, it was agreed that Arenson would operate on behalf of the Joint Venture, in applying for the TCN permits, as Arenson was the only registered contractor among the members of the Joint Venture, and thus the only member qualified under Israeli law to apply for the allocation of and entry permits for FWs.

30. On January 22, 2002, Arenson applied to the LA asking for an allocation for the Project for the year 2002. In its letter to the LA dated January 24, 2002, Arenson asked to treat the Project as a national project of the highest priority, and to approve the requisite allocation as soon as possible.

Schedule 2 A true copy of Arenson's application for an allocation for the Project for the year 2002 and the translation thereof are attached hereto and marked Schedule 2.

31. In parallel, the relevant officials at the Ministry of Defense (the "**MOD**") also addressed the LA, and a meeting was held on January 27, 2002, with the participation of the LA's Deputy General Manager. The purpose of the meeting was to obtain the immediate approval of the authorities for the granting of visas to TCNs for the Project, while stressing the national importance of the matter.

32. In consequence of the aforementioned Government Resolution No. 1141 of December 24, 2001, and the implementation of the "Closed Sky" Policy, Arenson was not successful in obtaining an immediate allocation for the Project.

33. During the first half of 2002, Arenson waited for the LA to publicize its allocations of FWs for the year 2002, as did the rest of the contractors in Israel.

34. On July 3 2002, the MOL published its list of the allocations for the year 2002. Arenson was allocated 784 permits, 523 of which were dedicated to the Project.

Schedule 3 A true copy of the Labor Authority's letter to Arenson of July 3, 2002, in respect of the allocation of FWs for the year 2002, and the translation thereof are attached hereto and marked Schedule 3.

## The Joint Venture's Lack of Ability to obtain TCNs for the Project due to the "Deserters" Policy

35. When Arenson attempted to utilize the 523 allocations and to cause the MOI to issue visas for such TCN's, MOI refused to comply due to the problem posed by the "Deserters".

36. It evolved that because a few hundred FWs who were imported into Israel by Arenson during 1999-2001, prior to the award of the Contract and without any connection with the Project, had deserted their work place, Arenson was barred from processing entry permits or otherwise engaging the 523 TCN's on the Project as approved for the year 2002.

37. As per Arenson's records, at the time that the allocations for 2002 were granted, at the beginning of July 2002, 511 FWs actually worked for Arenson on all of its construction sites. As per the MOI's records, however, there were 399 "deserters" registered in Arenson's name that were viewed by the MOI as employees of Arenson for all intents and purposes. Moreover, Arenson had 101 additional FWs registered in its name, who had exited Israel during such time period but for some unknown reason Arenson had not been "credited" for them. (See paragraph 24.2 above).

Schedule 4 A true copy of a table showing Arenson's projects and the number of permits, "deserters", non-credited FWs and actual employees for the years 2001-2003, is attached hereto and marked Schedule 4.

38. As per the MOI's method of calculation, Arenson was employing 1011 FWs at that time (i.e. 511 FWs actually on the job plus 399 registered FWs who "deserted" Arenson plus 101 non-credited FWs who had already left Israel), while its allocation for 2002 stood at only 784 FWs.

39. Thus, as per the MOI's position, not only was Arenson prohibited from importing additional employees in 2002, but was also obligated to ensure the repatriation of 227 FWs, out of the 511 that were working for Arenson at that time (1011-784).

40. It should be noted that the Joint Venture has devoted considerable resources to induce the FWs that it could employ to stay on the job.

41. As per recent studies performed by Bank Israel and Kav La'Oved, an Israeli association for the protection of workers rights, the average salary of an Israeli construction worker is NIS 4,560 (approximately $ 1,037) and the average salary of a FW in the construction industry is approximately $700.

In comparison, the Joint Venture is paying its TCNs NIS 4,800 (approximately $1,093) per month and an additional $100 inducement "bonus" per month for each TCN who reports to work over the entire month.

42. However, although the salary offered to FWs by the Joint Venture is higher than the average salary of a foreign construction worker, many FWs have been "deserting" Arenson

in order to work illegally for other employers, inter alia, for the following reasons:

42.1. Many FWs prefer to be employed illegally for employers who evade the taxes and levies imposed by the Government in respect of the employment of FWs, and who can offer them more "Take-home" money.

42.2. In addition, many FWs who were originally entered into Israel in order to work in the construction industry, desert their employers and shift to other "easier" sectors, such as nursing, domestic help, institutional help and industry.

## The Attempt to Transfer the Allocation from Arenson to ABB SUSA

43. In order to circumvent the obstacles presented by the "Deserters" Policy, Arenson suggested to transfer the approved allocations for the Project to ABB SUSA.

44. In order to carry out the transfer of the allocations, the Joint Venture had to overcome two new bureaucratic hurdles. The first was that the deadline for submitting requests for 2002 allocations had expired. The second was that ABB SUSA, as a foreign company, had to obtain an exemption from registration as a registered contractor with the Israeli Registrar of Contractors, since by law, only a registered contractor or a foreign entity exempt from such registration could file for an allocation of FWs.

45. On August 7, 2002, at the hearing of the aforementioned A.P 582/02, Arenson's suggestion fell on receptive ears and with the assistance of the Honorable Justice Zvi Segal, Arenson's counsel and the District Attorney for Jerusalem who was acting as counsel for the Ministries, reached an understanding with the aim of facilitating the transfer of the allocations from Arenson to ABB SUSA. This understanding was approved by the LA's Deputy General Manager and the representative of the MOI.

46. Within the framework of this understanding, which was formalized in the form of a judgement handed down by the court, the timetable for the filing of a new application to the LA, to enable ABB SUSA to submit a request to transfer the said allocations from Arenson to itself, was extended, with the LA undertaking to consider such application within 21 days. The court also recommended to the Registrar of Contractors to process ABB SUSA's application for an exemption expeditiously.

Schedule 5 A true copy of the transcript of the hearing and the judgment of the Honorable Justice Segal in A.P. 582/02 of August 7, 2002, and the translation thereof are attached hereto and marked Schedule 5.

47. On September 2, 2002, ABB SUSA filed an urgent application for an exemption from registration as a registered contractor with the Israeli Registrar of Contractors.

48. Despite the vigorous prosecution of this request, the process lasted almost four months. On December 26, 2002 the former Minister of Construction and Housing, Mr. Natan Sharansky, finally granted the exemption.

49. In parallel, in December 2002, ABB SUSA submitted a request for allocations to the LA branch located in the city of Afula.

50. On February 25, 2003, as no allocations had been made for the Project, Arenson appealed to the General Director of the LA with a request that he intervene and transfer to ABB SUSA the 523 allocations from Arenson for 2002.

Schedule 6 A true copy of Arenson's letter to the General Director of the Labor Authority of February 25, 2003, and the translation thereof are attached hereto and marked Schedule 6.

51. On March 9, 2003, as no response was received to said request, Arenson and ABB SUSA addressed the General Director of the LA once again, and requested him to transfer the 523 allocations for 2002 to ABB SUSA.

Schedule 7 A true copy of ABB's and Arenson's letter to the General Director of the Labor Authority of March 9, 2003, and the translation thereof are attached hereto and marked Schedule 7.

52. On March 11 2003, to the complete surprise of the Joint Venture, and contrary to all the understandings reached within the framework of the Court's decision of August 7, 2002, the LA's Legal Advisor advised that the LA had turned down the transfer request, alleging that it was aimed at circumventing the MOI's procedures. Moreover, the LA's Legal Advisor recommended that the Joint Venture address the officials at the MOI and convince them that the unusual circumstances of this case justify deviation from the procedures, so that Arenson be "credited" with the full allocation for 2002. However, such course of action had been previously proven to be futile and resulted in the submission of the aforementioned A.P 738/02, as stated in Section 27 above.

Schedule 8 A true copy of the Labor Authority's legal advisor's letter of March 11, 2003, and the translation thereof are attached hereto and marked Schedule 8.

53. In light of the urgency of the subject matter and in the hope that the personal intervention of all the relevant ministers would lead to a resolution of the problem and make redundant the need to resort to legal proceedings, the Joint Venture addressed the Minister of Labor and Welfare, the Minister of Interior and the Minister of Defense on March 25, 2003 with an urgent application for assistance in obtaining permits to employ TCNs.

A copy of such letter was also forwarded to the General Director of the LA, for his reaction.

Schedule 9 A true copy of the Joint Venture's application to the ministers of March 25, 2003 (without the schedules hereto) and the translation thereof are attached hereto and marked Schedule 9.

54. On April 3, 2003, after it became clear to the Joint Venture that the LA had been transferred, with the establishment of the new Government, to the authority of the MICL, the Joint Venture addressed the MICL and copied the Minister on the aforementioned letter of March 25, 2003.

Schedule 10 A true copy of the Joint Venture's letter to the Honorable Minister Olmert of April 3, 2003, and the translation thereof are attached hereto and marked Schedule 10.

## The Ministers' Total Disregard of the Joint Venture's Letter

55. To date, and despite a reminder, which was sent on April 27, 2003, the MOI made no response to the Joint Venture's letter. There was a similar lack of response from the MOD.

Schedule 11 A true copy of the reminder sent to the Minister of Interior on April 27, 2003, and the translation thereof are attached hereto and marked Schedule 11.

56. In contrast, the MICL replied to the Joint Venture on April 13, 2003 (through his secretariat) that the letter had been forwarded for the perusal and comments of his professional advisors and that upon receipt of their comments, he would respond to the application.

However, to this very day, with the exception of the disappointing response received from the General Director of the Labor Authority described below, the MICL has not taken any measure in order to alleviate the Joint Venture's predicament.

Schedule 12 A true copy of the letter from the Secretariat of the Minister of Industry, Commerce and Labor of April 13, 2003, and the translation thereof are attached hereto and marked Schedule 12.

57. Moreover, additional reminders that were sent to the Ministers on

May 27, 2003 did not evoke any response.

Schedule 13 True copies of the letters of the Joint Venture to the Honorable Ministers of May 27, 2003, and the translation thereof are attached hereto and marked Schedule 13.

## The Response of the General Director of the LA to the Joint Venture's Application

58. On April 2, 2003, Mr. Avner Oferi, the General Director of the LA, responded to the Joint Venture's application to the Ministers, described above.

In his reply, the General Director argued that in the proceeding that had taken place in A.P. 582/02, the Petitioners had been promised nothing with respect to the outcome of the handling of their application.

Moreover, in his letter, the General Director of the LA reiterated the opinion of the Legal Advisor of the LA, as stated in his letter of March 11, 2003, that in order to solve its problem in respect of the subject matter, the Joint Venture should address the MOI.

Schedule 14 A true copy of the letter of the General Director of the Labor Authority of April 2, 2003, and the translation thereof are attached hereto and marked Schedule 14.

59. The General Director argued that even if the LA had acceded to the application, ABB SUSA would not have been entitled to obtain an entry visa for TCNs, since ABB SUSA should be seen as the successor of Arenson.

60. Thus, according to the General Director of the LA, the Joint Venture would not be able to utilize the allocation for the Project until Arenson was credited for "Deserters", although such "Deserters" had deserted Arenson before the commencement of the Project and had originally been fired irrespective of the special allocation that was granted for the Project only in July 2002.

61. On April 7, 2003, the Joint Venture responded to the letter of the General Director of the LA and requested him to urgently call a meeting with the participation of all the relevant parties, namely, the LA, the MOI and the MOD, in order to reach a solution.

Schedule 15 A true copy of the Joint Venture's letter to the General Director of the Labor Authority, dated April 7, 2003, and the translation thereof are attached hereto and marked Schedule 15.

62. In his letter of reply dated April 15, 2003, the General Director of the LA reiterated his position as previously stated, referring the Joint Venture to the MOI to handle the matter.

Schedule 16 A true copy of the reply of the General Director of the Labor Authority dated April 15, 2003, and the translation thereof are attached hereto and marked Schedule 16.

## The Allocations for the Year 2003

63. On December 16, 2002, ABB SUSA applied to the LA asking for an allocation for the Project for the year 2003.

Schedule 17 A true copy of ABB SUSA's request of December 16, 2002 to issue permits to employ foreign workers for the Project for 2002, and the translation thereof are attached hereto and marked Schedule 17.

64. Concurrently. Arenson filed an independent application for 2003 for the other projects being carried out by it, irrespective of the Project.

Schedule 18 A true copy of Arenson's request to issue permits to employ foreign workers for its other projects, and the translation thereof are attached hereto and marked Schedule 18.

65. Despite the fact that Arenson's application did not apply to the Project, on June 26, 2003, Arenson received a letter from the Support Unit according to which Arenson was allocated 549 FWs for 2003.

Schedule 19 A true copy of the Labor Authority in respect of the allocation for the year 2003, and the translation thereof are attached hereto and marked Schedule 19.

In a telephone conversation that took place between Mr. Amnon Barkai, the Director of Human Resources at Arenson and the LA, it was elucidated that out of such 549 allocations, 523 allocations were intended for the Project and that the application filed by ABB SUSA had been denied.

Thus, once again, although a special allocation had been made for the Project, such allocations could not be utilized due to the unreasonable identification between Arenson and the Joint Venture, and the consequent applications of the "Deserter" Policy.

## The Understanding Reached within the Framework of A.P 738/02

66. On June 26, 2003, within the framework of A.P 738/02, Arenson's counsel and the District Attorney for Jerusalem who was acting as counsel for the MOL, the MOI and the Minister of Interior Security reached an understanding that will hopefully enable the Joint Venture to utilize the allocations granted in

respect of the Project.

67. An interim order reflecting such understanding was granted, freezing the status quo, so that the Government authorities may not deport the FWs that are actually employed by Arenson for as long as (1) their number does not exceed the full allocation that it received from the LA; and (2) none of the FWs stayed in Israel for longer than 54 months.

Schedule 20 A true copy of Arenson's letter to the District Attorney of June 26, 2003, and the reply of the District Attorney of June 26, 2003, and the translations thereof are attached hereto and marked Schedule 20.

68. Consequently, on July 6, 2003, the Joint Venture informed the District Attorney for Jerusalem that it had decided to suspend its legal actions against the relevant Government authorities in the hope that the implementation of the foregoing understanding will result in its being able to engage TCNs for the Project.

Schedule 21 A true copy of the Joint Venture's letter to the District Attorney of July 6, 2003, and the translation thereof are attached hereto and marked Schedule 21.

## Arenson's Attempts to Recruit Israeli Manpower on behalf of the Joint Venture

69. It should be noted that concurrently with its efforts to resolve the problem of FWs vis-a-vis all the relevant authorities, the Joint Venture has devoted an extensive amount of time and resources towards recruiting Israeli workers for the Project.

70. Arenson appealed on numerous occasions to the LA's employment bureau in an attempt to recruit hundreds of Israeli construction workers (mainly scaffolders and welders).

71. Despite the fact that the refusal of the Israeli Government to allow the importation of FWs into Israel is based, inter alia, on the high rate of unemployment among Israeli nationals, not a single Israeli worker was referred to Arenson for the Project by the LA.

Moreover, in a telephone conversation that took place between the Director of Human Resources at Arenson and the Director of the LA at Rosh Haayin, following Arenson's request to refer Israeli workers to it, the latter undertook to hold an employment fair for the purpose of recruiting Israeli workers for the Project.

The Director of the Rosh Haayain LA reiterated this undertaking on June 10, 2003 in another conversation he had with Mr. Amnon Barkai, but such employment fair never took place.

72. As of the date hereof, despite numerous attempts, the Joint

Venture has never been successful in recruiting even a single Israeli construction worker through the LA to work on the Project.

**The Mobilization of FWs from other Arenson Projects**

73. In order to mitigate the effects of the restrictions imposed by the Government, the Joint Venture has employed FWs who originally entered into Israel under work permits granted to Arenson for other projects.

74. However, due to its exclusive nature, complexity and scope, the Project management contends that the Project cannot be efficiently constructed to the specified quality standards unless the Joint Venture can continually utilize TCNs dedicated to the Project on a long-term basis.

75. Moreover, since certain subcontractors (e.g. for panel installation and steel spatial frame erection) were not able to employ the experienced FWs required for the execution of their scope of works, the Joint Venture had to terminate these agreements and contract with other subcontractors who utilize either FWs already residing within Israel or Israeli workers, all at a loss to the project schedule and a significant cost impact.

**Summary and Conclusions**

76. After the Contract went into force and effect the Israeli Government enacted a drastic change of policy, which prevented the Joint Venture from employing TCNs.

77. In practice, until this very day, although in both 2002 and 2003, 523 allocations were issued for the Project, not a single entry permit has been obtained to bring a TCN into Israel for the Project, despite the vigorous efforts made by Arenson, ABB SUSA and the Joint Venture.

On June 26, 2003, Arenson's counsel and the District Attorney for Jerusalem reached an understanding that hopefully will enable the Joint Venture to finally utilize the Arenson allocation of TCNs for the Project. The Joint Venture will purportedly be allowed to engage qualified foreign construction workers already situated in Israel, provided that they do not reside here for longer than 54 months.

# EXHIBIT 2

# AAB JV – Nachshonim Storage Base Project
## 55 Calendar Day Delay to DSB Construction Due To Shortfall Of TCN Labor



# EXHIBIT 3

**NACHSHONIM**
**AAB JV JOINT VENTURE**
**Additional Costs - Shortage of TCN Labor**

**EXHIBIT 3**
**(page 1)**

| Item | Description | Unit | | USD Unit Cost | Quantity | USD Total Labor | USD Total Material | USD Total Equipt. | USD Total S/C | USD Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Additional Direct Costs - Increase in Labor Rate (See attached detail) | LS | | 1,885,591 | 1 | 1,885,591 | 0 | 0 | 0 | 1,885,591 |
| 2 | Additional Direct Costs - Subcontracts (See attached detail) | LS | | 1,068,432 | 1 | 0 | 0 | 0 | 1,068,432 | 1,068,432 |
| 3 | Additional Direct Costs - Additional Man-hours for Less Productive Local Workers versus TCNs (See attached detail) | LS | | 335,330 | 1 | 335,330 | 0 | 0 | 0 | 335,330 |
| 4 | Additional Costs - JV Site Overheads for 55-Day Delay (See attached detail) | Mo. | | 402,917 | 1.81 | 546,422 | 182,141 | 0 | 0 | 728,563 |
| | SUBCONTRACT | | | 22% (Sub-subcontracted) | | | | | 1,068,432 | |
| | | | | | | **SUBTOTAL COST** | | | | **4,017,915** |
| | | | | | | **BOND & INSURANCE** | | | **0.96%** | **38,572** |
| | | | | | | **ADMIN. OVERHEAD** | | | **9.90%** | **397,774** |
| | | | | | | **SUBTOTAL COST** | | | | **4,454,261** |
| | | | | | | **FEE** | | | **8.30%** | **369,704** |
| | | | | | | **TOTAL MODIFICATION** | | | | **4,823,964** |

## COMPUTATION OF CONTRACTOR'S ALLOWABLE PROFIT

AAB Joint Venture

**EXHIBIT 3**
**(page 2)**

CONTRACT NO. DACA90-01-C-0043 M - NO.:

**REA - Additional Costs - Shortage of TCN Labor**

| FACTOR: | RATE | X | WEIGHT = | VALUE |
|---|---|---|---|---|
| 1 DEGREE OF RISK<br>HIGH RISK = .12<br>LOWEST RISK = .03<br>(CONSIDER: TYPE; PORTION SUBCONTRACTED; LOCATION OF WORK; REASONABLENESS OF NEGOTIATED COSTS; AMOUNT OF LABOR; AND WHETHER NEGOTIATIONS TAKE PLACE BEFORE OR AFTER WORK IS DONE) | 20 | X | 0.10 | 2.00 |
| 2 RELATIVE DIFFICULTY OF WORK<br>MOST DIFFICULT = .12<br>SIMPLEST = .03<br>(THIS IS RELATED TO NO. 1; CONSIDER: TYPE, LOCATION, TIME, AND WHO WILL DO THE WORK) | 15 | X | 0.07 | 1.05 |
| 3 SIZE OF JOB OR CHANGE ORDER<br>LESS THAN $100,000 = .12<br>$0.1 - 5 MILLION = .12 TO .05<br>$5 TO 10 MILLION = .04<br>$10 MILLLION AND OVER = .03 | 15 | X | 0.07 | 1.05 |
| 4 PERIODS OF PERFORMANCE<br>MORE THAN 24 MONTHS = .12<br>NOT TO EXCEED 30 DAYS = .03<br>NO ADDITIONAL TIME = 0 | 15 | X | 0.04 | 0.60 |
| 5 CONTRACOR'S INVESTMENT<br>BELOW AVERAGE = .03 TO .05<br>AVERAGE = .06 TO .09<br>ABOVE AVERAGE = .10 TO .12<br>(CONSIDER: AMOUNT OF SUBCONTRACTING; MOBILIZATION; COST OF GFE AND PAYMENTS) | 5 | X | 0.10 | 0.50 |
| 6 ASSISTANCE BY GOVERNMENT<br>AVERAGE TO ABOVE AVERAGE = .12 TO .03<br>(CONSIDER: GFE; EXPEDITING HELP, ETC) | 5 | X | 0.12 | 0.60 |
| 7 SUBCONTRACTING<br>80% TO 100% = .03<br>0% TO 80% = .12 TO .03 | 25 | X | 0.10 | 2.50 |
| TOTAL | 100 | | | **8.30%** |

A.A.B. JOINT VENTURE
ABB SUSA\ A. ARENSON\ BARAN GROUP
NACHSHONIM STORAGE BASE, ELAD

א.א.ב. – מיזם משותף
אבב – סוסה/ א. ארנסון/קבוצת ברן
פרוייקט בסיס אחסון נחשונים, אלעד

Analysis at 30 June 2004

EXHIBIT 3
(page 3)

## ADDITIONAL DIRECT COSTS - INCREASE IN LABOR RATE SHORTAGE OF TCN LABOR

### ADDITIONAL COST OF Local Labor Versus Foreign Labor - JV SELF PERFORM WORK

**BID an average $ 6.00 PER HOUR**

| | |
|---|---|
| AVERAGE HOURLY COST TO JUNE 2004 | $7.05 |
| TOTAL MANHOURS WORKED TO JUNE 2004 | 1,357,217 |
| 1,357,217 HRS X $ (7.05 - 6.00 avg bid) | **$1,425,078** |

<u>FORECAST OF AVERAGE HOURLY COST TO COMPLETE</u>

| | |
|---|---|
| PER AVERAGE HOURLY COST IN JUNE 2004 | $7.62 |
| MANHOURS TO COMPLETE (WITHOUT PANELS) | 198,054 |
| MANHOURS TO COMPLETE DISMANTLE 25% OF INSTALLED PANELS | 2,304 |
| MANHOURS TO COMPLETE INSTALL 142,000 M2 NEW PANELS | 83,909 |
| TOTAL MANHOURS TO COMPLETE | 284,267 |
| 284,267 HRS X $ (7.62 - 6.00) | **$460,513** |

| | |
|---|---|
| **TOTAL Additional Cost Due to Local Workers More Costly Than Foreign Workers** | **$1,885,591** |

**ACTUAL RATE / HR $7.62 / AS - BID $6.00/HR 1.27**

# SUBCONTRACTS WITH TRADITIONAL TCN LABOR CONTENT

EXHIBIT 3

(page 4)

| NAME | SCOPE | DATE SIGNED | TOTAL SUBCONTRACT VALUE | MATERIALS / OTHER | | LABOR (All Israeli) | | TRADITIONAL LABOR MIX | | | | TOTAL TRADITIONAL LABOR COST | ADDITIONAL SUBCONTRACT COSTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ISRAELI | | TCN | | | |
| | | | | % | $ | % | $ | % | $ | % | $ | | |
| | | | | (Judgment) | | (Judgment) | | (Judgment) | | Note (1) | Note (2) ISR $/1.26 | | |
| | | | (1) | | (2) | | (3) | | (4) | | (5) | (6) (6) = (4) + (5) | (7) = (3) - (6) |
| AG BUILDING | ASHBOND BLOCKWALL | 25-Apr-04 | $160,000 | 45% | $72,000 | 55% | $88,000 | 10% | $8,800 | 90% | $62,362 | $71,162 | $16,838 |
| APYD | STRUCTURAL STEEL | 4-Feb-04 | $998,750 | 10% | $99,875 | 90% | $898,875 | 50% | $449,438 | 50% | $353,888 | $803,325 | $95,550 |
| GANEI HEBRON | LANDSCAPING | 28-Aug-03 | $521,261 | 70% | $364,883 | 30% | $156,378 | 10% | $15,638 | 90% | $110,819 | $126,457 | $29,921 |
| RESHET KOHL | FENCING | 1-Oct-03 | $334,588 | 75% | $250,941 | 25% | $83,647 | 50% | $41,824 | 50% | $32,932 | $74,755 | $8,892 |
| NYGA LTD | KITCHEN EQUIPMENT | 16-Feb-04 | $208,280 | 75% | $156,210 | 25% | $52,070 | 100% | $52,070 | 0% | $0 | $52,070 | $0 |
| BRICK | JOINTS SEALING | 5-Oct-03 | $222,000 | 40% | $88,800 | 60% | $133,200 | 10% | $13,320 | 90% | $94,394 | $107,714 | $25,486 |
| HUDJA DAVID | PAINTING WORKS | 16-Oct-03 | $423,895 | 25% | $105,974 | 75% | $317,921 | 10% | $31,792 | 90% | $225,299 | $257,091 | $60,831 |
| METAL PRESS LTD | SMOKE RELEASE SYSTEM | 15-Sep-03 | $127,630 | 80% | $102,104 | 20% | $25,526 | 100% | $25,526 | 0% | $0 | $25,526 | $0 |
| SHELRON | STRUCTURAL STEEL | 5-May-03 | $993,250 | 10% | $99,325 | 90% | $893,925 | 50% | $446,963 | 50% | $351,939 | $798,901 | $95,024 |
| KARIV | PRECAST ELEMENTS | 30-Apr-03 | $498,993 | 50% | $249,497 | 50% | $249,497 | 25% | $62,374 | 75% | $147,340 | $209,715 | $39,782 |
| KOOR METALS | PANELS | 13-Sep-03 | $1,920,000 | 20% | $384,000 | 80% | $1,536,000 | 50% | $768,000 | 50% | $604,724 | $1,372,724 | $163,276 |
| GAL ALBEST | PANELS | 14-Sep-03 | $960,000 | 20% | $192,000 | 80% | $768,000 | 50% | $384,000 | 50% | $302,362 | $686,362 | $81,638 |
| ALUMAYER | WINDOWS | 3-Aug-03 | $416,272 | 80% | $333,018 | 20% | $83,254 | 80% | $66,604 | 20% | $13,111 | $79,714 | $3,540 |
| ELTRON | ROLLING DOORS | 24-Jan-02 | $699,917 | 80% | $559,934 | 20% | $139,983 | 100% | $139,983 | 0% | $0 | $139,983 | $0 |
| ELCO | INFRASTRUCTURE | 16-Sep-01 | $1,056,323 | 55% | $580,978 | 45% | $475,345 | 50% | $237,673 | 50% | $187,144 | $424,817 | $50,529 |
| MOTOROLA | COMMUNICATIONS | 29-Nov-01 | $8,775,000 | 80% | $7,020,000 | 20% | $1,755,000 | 100% | $1,755,000 | 0% | $0 | $1,755,000 | $0 |
| KABAN STEEL | STEEL STRUCTURES | 28-Aug-02 | $2,750,000 | 35% | $962,500 | 65% | $1,787,500 | 50% | $893,750 | 50% | $703,740 | $1,597,490 | $190,010 |
| KOOR METALS | STEEL STRUCTURES | 23-Apr-02 | $2,200,000 | 35% | $770,000 | 65% | $1,430,000 | 50% | $715,000 | 50% | $562,992 | $1,277,992 | $152,008 |
| KSMG | RETAINING WALLS | 8-Sep-03 | $382,000 | 35% | $133,700 | 65% | $248,300 | 10% | $24,830 | 90% | $175,961 | $200,791 | $47,509 |
| PALRIN | METAL DOORS | 29-Apr-04 | $893,710 | 80% | $714,968 | 20% | $178,742 | 80% | $142,994 | 20% | $28,148 | $171,142 | $7,600 |
| EK | ELECTRICAL/MECHANICAL | | $16,500,000 | 80% | $13,200,000 | 20% | $3,300,000 | 100% | $3,300,000 | 0% | $0 | $3,300,000 | $0 |
| TOTAL | | | $41,041,869 | 64% | $26,440,705 | 36% | $14,601,164 | | $9,575,577 | | $3,957,155 | $13,532,732 | $1,068,432 |

Note: (1) TCN LABOR Content represents traditional use of TCN or foreign labor for respective craft. (Judgment)

Note: (2) Additional 27% Cost to replace TCNs with Israelis, or more expensive TCNs, due to "Closed Skies Policy".

ACTUAL RATE / HR $7.62 / AS - BID $6.00/HR = 1.27

***Analysis at 30 June 2004***

**EXHIBIT 3**
**(page 5)**

# ADDITIONAL MAN-HOURS FOR LOSS OF PRODUCTIVITY

## JV SELF PERFORM WORK

### As - Bid Productivity

| | | | |
|---|---|---|---|
| a. | *Quantity of concrete in original BID:* | | *119,711 m3* |
| b. | *Man-hour required according to original BID, based on extensive prior experience with foreign workers :* | | *925,049 hrs* |
| c. | *Productivity As-Bid (b/a) :* | | ***7.727 hrs/m3*** |

### Actual Productivity

| | | | |
|---|---|---|---|
| d. | Quantity of concrete cast to date : | 138,328 m3 | |
| e. | Concrete to go : | 8,579 m3 | |
| f. | *Quantity of concrete at completion (d+e) :* | | *146,907 m3* |
| g. | Man-hour to date : | 1,068,973 hr | |
| h. | Man-hours to go : | 120,233 hr | |
| I. | *Man-hour at completion (h+g) :* | | *1,189,206 hrs* |
| j. | *Actual productivity ( I/f ) :* | | ***8.095 hrs/m3*** |

| | |
|---|---|
| ***Differences in productivity due to inefficiencies of local workers versus foreign workers ( j - c ) :*** | ***0.368 hrs/m3*** |
| ***Total loss in efficiency of concrete labor throughout the project :*** | |
| *119,711m3 x (8.095 hrs/m3 - 7.727 hrs/m3) =* | ***44,007 hrs*** |
| ***Forecast of average hourly cost to complete :*** | ***7.62 $/hrs*** |

***TOTAL Additional Costs Due to Loss of Productivity*** ***$335,330***

EXHIBIT 3
(PAGE 6)

## Nachshonim Site Overheads
## April 2003 through November 2003

| | | Apr-03 | May-03 | Jun-03 | Jul-03 | Aug-03 | Sep-03 | Oct-03 | Nov-03 | Average |
|---|---|---|---|---|---|---|---|---|---|---|
| 201 | **Indirect Labor (Salaries+ Expenses)** | | | | | | | | | |
| A | ABB SUSA | 59,616 | 62,465 | 49,933 | 51,210 | 50,236 | 72,132 | 75,655 | 68,745 | 61,249 |
| B | ARENSON | 88,957 | 95,786 | 109,799 | 110,389 | 109,860 | 103,637 | 112,519 | 114,151 | 105,637 |
| C | BARAN | 34,546 | 45,016 | 42,986 | 60,790 | 66,006 | 65,386 | 68,291 | 57,764 | 55,098 |
| D | QC PANELS | | | | | 4,264 | 5,629 | 5,572 | 5,585 | 2,631 |
| E | SHAHAK SECURITY | 24,702 | 25,175 | 24,545 | 25,037 | 24,864 | 25,147 | 24,862 | 25,018 | 24,919 |
| F | SAFETY - RAM SHALHEVET | 14,385 | 14,385 | 15,197 | 14,385 | 14,385 | 14,385 | 14,385 | 14,385 | 14,486 |
| G | HOUSE KEEPING + MISC | 14,130 | 14,192 | 18,838 | 18,912 | 18,201 | 18,571 | 33,798 | 31,877 | 21,065 |
| | TOTAL LABOR + EXPENSES | 236,337 | 257,020 | 261,298 | 280,723 | 287,815 | 304,888 | 335,081 | 317,525 | 285,086 |
| 203 | **A. Arenson Office Fees (JV Accounting)** | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| 204.01 | **Canteen** | 3,800 | 4,293 | 4,875 | 4,852 | 4,831 | 5,202 | 5,308 | 5,748 | 4,864 |
| 204-206 | **JV / COE Site Office Buildings / Equipment** | | | | | | | | | |
| A | Temporary Infrastructure (Depreciation) | 13,418 | 13,418 | 13,418 | 13,926 | 13,926 | 13,926 | 14,249 | 14,249 | 13,816 |
| B | Office Furniture (Depreciation) | 1,387 | 1,387 | 1,387 | 1,751 | 1,751 | 1,751 | 1,859 | 1,859 | 1,642 |
| C | Electronic Equipment (Depreciation) | 4,016 | 4,016 | 4,016 | 4,688 | 4,688 | 4,688 | 4,141 | 4,141 | 4,299 |
| 207 | **COE Living Accomodations** | | | | | | | | | |
| A | Rental | 12,892 | 12,892 | 12,892 | 13,239 | 13,239 | 9,151 | 9,151 | 9,151 | 11,576 |
| B | Utilities / Maintenance | 959 | 1,973 | 1,223 | 3,639 | 1,710 | 1,941 | 876 | 3,341 | 1,958 |
| 208 | **Job Site Office Expenses JV+COE** | | | | | | | | | |
| A | Courier Service & Postage | 57 | 63 | 51 | 41 | 222 | 45 | | | 60 |
| B | Telephone | 1,264 | 1,123 | 947 | 1,734 | 1,163 | 1,470 | 1,333 | 1,419 | 1,307 |
| C | Cellphones | 1,967 | 2,142 | 2,148 | 2,221 | 2,595 | 2,535 | 2,282 | 2,300 | 2,274 |
| D | Fax | | 126 | | | 156 | | | 32 | 39 |
| E | Internet | 134 | 137 | 135 | 157 | 134 | 136 | 134 | 136 | 138 |
| F | Office supplies and Consumables | 778 | 2,202 | 2,293 | 1,994 | 1,678 | 1,735 | 1,973 | 584 | 1,655 |
| G | Printing and Copying | 919 | 506 | 579 | 780 | 955 | 571 | 558 | 1,231 | 762 |
| H | Progress Photos | | 447 | 145 | | 543 | 759 | 433 | | 291 |
| I | Repair Office Equipment / Telephone System / Computers | 7,213 | 3,054 | 1,185 | 296 | 2,178 | 626 | 507 | 647 | 1,963 |
| J | Safety/Medical Supplies/Pest control | 403 | 4,016 | 524 | 1,123 | 589 | 1,912 | 409 | 4,214 | 1,649 |
| 211 | **Miscellaneous Job Expenses** | | | | | | | | | |
| A | Temporary Light and Power (F.K) | 2,340 | 1,991 | 3,870 | 2,507 | 1,983 | 2,243 | 2,556 | 2,402 | 2,486 |
| B | Toilets (Sherutyon) - Net | 818 | 833 | 858 | 1,123 | 1,091 | 1,119 | 1,259 | 1,330 | 1,054 |
| C | Sewage Pump (Peretz) - Net | 796 | 480 | 765 | 745 | 810 | 412 | 735 | 607 | 669 |
| D | Water supply (Neviot/Mey Eden + Mekorot) | 221 | 640 | 704 | 961 | 852 | 728 | 1,025 | 478 | 701 |
| E | Garbage Removal (Rom Shinua) - Net | 2,853 | 823 | 3,826 | 2,913 | 1,688 | 536 | -67 | 3,889 | 2,058 |

EXHIBIT 3
(PAGE 6)

## Nachshonim Site Overheads
## April 2003 through November 2003

| | | Apr-03 | May-03 | Jun-03 | Jul-03 | Aug-03 | Sep-03 | Oct-03 | Nov-03 | Average |
|---|---|---|---|---|---|---|---|---|---|---|
| 212 | **Vehicles** | | | | | | | | | |
| A | JV +COE Vehicles Lease (New Kopel) | 5,631 | 5,798 | 6,047 | 5,571 | 5,290 | 5,464 | 5,369 | 5,432 | 5,575 |
| B | JV +COE Fuel (Pazomat) | 1,096 | 1,349 | 1,324 | 1,490 | 1,370 | 1,222 | 1,092 | 1,223 | 1,271 |
| C | Maintenance (Pick ups + Evacuation vehicle) + Car wash | 1,023 | 1,939 | 612 | 1,363 | 2,813 | 1,915 | 2,918 | 4,067 | 2,081 |
| 213 | **Fuel and Other Consumables (70%)** (30% used for on-site power) | 4,728 | 4,917 | 5,628 | 7,646 | 6,847 | 6,960 | 7,834 | 10,000 | 6,820 |
| 214 | **Insurance, Taxes, Bonds and Financing Cost** | | | | | | | | | |
| A | Progect Insurance (Clal) | | | | | | | | | |
| B | Performance bond | 14,399 | 14,399 | 14,399 | 14,399 | 14,399 | 14,399 | 14,399 | 14,399 | 14,399 |
| C | Financing costs | | | | | | | | | |
| 218,224 | **Legal & Claims Consultants** | | | | | | | | | |
| A | Baratz | 4,599 | 4,500 | 20,327 | 4,533 | 4,561 | 29,671 | 16,902 | 14,752 | 12,481 |
| B | Zell Goldberg & Co. | | | | | | | 6,300 | 4,675 | 1,372 |
| C | Contract Solutions + Expenses | | | | | | | 25,280 | 40,161 | 8,180 |
| D | Bell, Boyd & Lloyd | 4,243 | | | | | 13,311 | | | 2,194 |
| 218 | **CPA Services (Brightman-Almagor)** | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 0<br>2,500 |
| 218 | **Misc** | | | | | | | | | |
| A | Travel | | | | | 1,265 | 2,029 | 2,185 | 1,657 | 892 |
| B | Translation | | | | 1,920 | 1,037 | | 724 | 2,778 | 807 |
| | **Monthly Site Expenses** | 334,789 | 352,985 | 371,977 | 382,833 | 388,679 | 437,844 | 473,306 | 480,926 | 402,917 |